### FIBRE CONDUIT CO. v. BANKAMERIC CORPORATION et al.

Circuit Court of Appeals, Second Circuit.
July 2, 1928.

No. 326.

Patents ☞328—1,530,200, claims 3, 7, and 20, for conduits to contain electrical wiring in office buildings, held not infringed.

Richardson and Coggeshall patent, No. 1,530,200, claims 3, 7, and 20, for system of conduits to contain electrical wiring necessary in large modern office buildings, *held* not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Fibre Conduit Company against the Bankameric Corporation and others for infringement of patent. From the decree (21 F.[2d] 756), plaintiff appeals, in so far as it holds that certain of defendant's practices did not infringe. Affirmed in part, and reversed in part.

The defendant appeals from a decree (21 F.[2d] 756) of the District Court for the Southern District of New York holding valid claims 3, 7, and 20 of patent 1,530,200, to Richardson and Coggeshall, granted March 17, 1925, and further holding these claims to have been infringed by certain of the defendant's practices. The plaintiff appeals from the same decree in so far as it holds that other practices of the defendant did not infringe the claims.

The patent related to a system of conduits to contain the electrical wiring necessary in large modern office buildings. It presupposed that these conduits should be embedded in the concrete floors of the buildings and was intended to avoid the necessity of deciding in advance where outlets were to be made for office fixtures. Unless some such device is used, it is necessary to tear up a substantial part of the floor and lay a new conduit whenever a new fixture is installed.

The invention was therefore to achieve a "flexibility" in respect of the wiring scheme and this was provided as follows: Conduits, preferably of fiber, segmental in section, are laid parallel to one another at intervals upon the "slab" of the floor, resting on their chordal side. They may be made to adhere to the slab by means of asphalt, concrete, or the like, but the top of the arch must be some distance below the finished surface of the floor. After being so set, a fill of cinder or some such substance is tamped in over the conduit until a height is reached at which the "thin" finishing layer of the concrete is added to make the floor surface. When thus in position the conduit is embedded in the "slab" and does not show on the surface.

If at any time it is necessary to make an outlet for a new and unforeseen fixture, the top layer of concrete can be chiseled, the fill removed, and the top of the conduit bored through. Into the hole so made a threaded outlet is then screwed, so set as to be just flush with the floor level. The fill is then restored and concrete filled in around the top of the outlet, to make an unbroken floor surface. Not only is the final layer described as "thin," but the depth of the conduit below the surface is prescribed as "relatively slight in some cases and greater in others."

The claims are as follows:

"3. The steps in a method of building, which comprise constructing a floor slab, including a wire duct within and substantially parallel with the floor surface of the slab, cutting through the slab into the duct at a point determined by the location of a device to be supplied with current, applying a fitting to the duct, and filling the space

around the fitting with cementitious material."

"7. In combination, a floor slab, a duct within the slab, a fitting having a part narrower than the duct adapted to be fitted into the upper part of the duct and extend through the floor to the surface."

"20. The method of laying and utilizing conduit in floors which comprises placing the conduit on a lower course of the floor, then applying filling material around and over the conduit, then covering the whole with a continuous integral surface floor, and subsequently cutting through the surface floor and into the conduit, and applying an outlet fitting, and introducing the wiring."

On July 2, 1907, a patent was granted to one Alexander for a similar invention. This was for wiring conduits set in concrete floors designed to give the same "flexibility" as the patent in suit. The conduits were of metal, square in section, and set in grooves in the floors, ordinarily flush with the surface, so that their flat top was exposed and made part of the floor surface. Through the top holes were to be bored wherever an opening was desired, a bushing inserted and the wires drawn, or "fished," through for the fixture. While, as has just been said, the invention was primarily designed to have the top of the conduit exposed, the specifications disclosed in several places that it might be covered by the concrete surface. One passage reads: "These conduits are illustrated as having flat exposed surfaces which are preferably substantially flush with the exposed surfaces of the partitions in which they are embedded, although in some cases they may be completely embedded near the surface of a partition, but accessibility is required." The term "partition" included a floor. Again: "In the drawings the floor partitions, 9 and 10, are illustrated as each provided with a series 11 of these interconnecting accessible conduits, embedded substantially flush with the finished floors. However, this specific location is for purposes of illustration merely, as the location of these conduits might be upon any desired surface of any desired partition and they might be slightly covered by a partition." The conduits which were not to be tapped were to be "completely embedded" in their partitions. "It is quite the contrary however with the conduits, 11"; i. e., those which were to be tapped. "One surface or face of each of these conduits lies substantially flush with, or covered only by, a thin layer of, the exposed face of the partition." They must be accessible, and if it is desired

to make an opening, at the selected spot, "an opening is made in the exposed face of the conduit, or through the thin layer of building material and then into the conduit, if it is completely embedded."

Alexander's patent was the result of his practical work in the construction of the Baltimore & Ohio Building in Baltimore in 1905. For this he devised the plan later disclosed in the specifications, in the execution of which in places where it was structurally necessary or convenient to do so, he sank the conduits, so as not to be flush with the floor. At times, as is shown by Exhibit S, the conduit was flush with the concrete, but covered by a wooden floor. At other times, Exhibit T, it was sunk below the level of the concrete itself.

In the view taken by the court, it is not necessary at length to set out the defendant's practice. It manufactures metal conduits, square in section, having at regular intervals upright tubular outlets fixed in it, opening upwards. These are part of the structure, inserted at the time of manufacture. In construction the conduit must therefore be carefully laid, so that the tops of the outlets, of predetermined height, will come just flush with the surface of the floor. After installation, in the construction taken as an infringement, it became necessary for the defendant in certain instances to make new outlets, and this it did by boring through the floor and the top of the conduit and setting in the holes outlets not already provided. The conduit with fixed outlets is called the "preset" system; it was held not to infringe. The judge thought the later practice was within the claims.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds and Leslie B. Young, both of New York City, of counsel), for appellants.

Harry E. Knight and Clifton V. Edwards, both of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). That there was an invention of genuine merit in the patented disclosure we quite agree, though it appears to us clumsier than what the defendant has devised. That is often the case with first steps. We should unhesitatingly regard it as patentable if it were not for the prior art, of which we need consider only Alexander, because his patent seems to us fatal to their validity if the claims be taken broadly.

The so-called "flexibility" of the system was certainly here disclosed, and, if he had unmistakably buried his conduits, we do not see how the plaintiff could make even a plausible argument for novelty. It insists, however, that the disclosure only contemplated conduits flush with the surface. That this was the usual form intended we agree, but it seems equally certain that the disclosure also assumed that they might be buried, if the builder so chose. The abstracts from the specifications appear above; we need not labor then, for they seem to us too plain for argument.

It is true that Alexander's specifications always insist upon accessibility, and for obvious reasons. One must not have to bore through too much concrete. The patentees in part avoided that difficulty by a thin crust of concrete over a cinder fill. But that makes no difference. Once one conceives of a covered conduit, the depth of the covering is plainly a matter for the builder's design in each case. As Alexander says in his patent, "the details of each particular installation are governed in a large extent by the requirements in each instance." The criticism of the plaintiff that Alexander's top layer was to be "thin" is answered by the patent itself, which prescribed precisely the same thing (page 2, line 84; page 4, line 84). Its thickness would necessarily depend upon what service was expected. If the surface was to be protected by a substantial wooden flooring, it might be slight, no more than enough to keep out water. If it was to be directly exposed to the movement of heavy objects, like safes or cabinets, surely it took no invention to provide a thick enough layer to sustain the wear. The divergences shown in the Baltimore & Ohio Building prove, if proof be necessary, that the construction would inevitably vary with the conditions.

Nor do we think that Alexander fails as an anticipation because he shows only bushings, instead of outlets proper. Here, too, it is plain that, if the conduit be sunk and any outlet is necessary, its depth must vary with the distance it must span. It is true that in the instance in which the conduit was sunk well below the surface in the Baltimore & Ohio Building no outlet or bushing was inserted and the conduit was pervious to water. But, try as we may, we cannot bring ourselves to believe that it was invention to lengthen the disclosed bushing as the depth of conduit below the surface might require.

While, therefore, we quite agree with the learned District Judge that the claims cannot be infringed by the "preset" system, we cannot agree that they are in any sense a revolutionary advance beyond Alexander. On the contrary, it appears to us that, unless the claims be limited strictly to the disclosure, they are not valid. That they may survive if so construed is perhaps possible. We are content to dispose of the case on the basis of noninfringement, leaving them at least a theoretical validity, if that be of any service to the patentees.

Decree reversed in so far as it holds that the defendant infringed by its practice after the "preset" conduits were installed; affirmed in so far as it holds that the "preset" conduits do not infringe.